NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| EMERSON O. C.-S., | : | |
| Petitioner, | : | Civil Action No. 20-3774 (JMV) |
| v. | : | OPINION |
| WILLIAM ANDERSON, et al., | : | |
| Respondent. | : | |

**VAZQUEZ, District Judge:**

Presently pending before the Court is Petitioner Emerson O. C.-S.'s [1], ("Petitioner") petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 and requests for declaratory and injunctive relief. D.E. No. 1. For the reasons detailed below, the Court denies the petition for writ of habeas corpus and requests for declaratory and injunctive relief.

**I.     Background**

Petitioner is an immigration detainee being held by the Department of Homeland Security, Immigration and Customs Enforcement ("DHS/ICE") at the Essex County Correctional Facility ("ECCF") in Newark, New Jersey. The instant motion was filed in the wake of the ongoing COVID-19 pandemic,[2] that has been reported to have been contracted by both ECCF personnel, immigration detainees and inmates.

---

[1] Petitioner is identified herein only by his first name and the first initials of his surname in order to address certain privacy concerns associated with § 2241 immigration cases. This manner of identification comports with recommendations made by the Judicial Conference of the United States' Committee on Court Administration and Case Management.

[2] COVID-19 is an abbreviation of the coronavirus disease 2019, a respiratory illness that can

Petitioner is a native and citizen of Guatemala who entered the United States in 1997 without being admitted or paroled. D.E. 1 at 7-8. Petitioner was first arrested on March 5, 2012, and charged with peering in the fourth degree in violation of N.J.S.A. § 2C:18-3a. *Id.* at 7. That charge was dismissed for lack of evidence; however it resulted in the issuance of a Notice to Appear by DHS charging Petitioner as an alien present without being admitted or paroled under the Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i). *Id.* at 8. Petitioner was released on bond and conceded removability before an Immigration Judge ("IJ") on April 30, 2013. *Id.* He also applied for cancellation of removal for non-permanent residents pursuant to INA § 240A(b). *Id.*

Petitioner is currently detained pursuant to 8 U.S.C. §1226(a) as a result of his arrest for various sexual offenses on February 28, 2019. D.E. 1-7 at 2. On March 6, 2019, Petitioner was released from state custody with non-monetary conditions of release. D.E. 1-12 at 2. On that same day, ICE issued an immigration detainer. D.E. 1 at 9. On July 9, 2019, Petitioner was indicted in the Superior Court of New Jersey, Mercer Vicinage, on nine counts, five of which were second-degree sexual assault of a victim who was less than thirteen years old. D.E. 1-8.

On January 16, 2020, an IJ convened a hearing addressing the merits of Petitioner's application for cancellation of removal and ultimately granted the application. D.E. 1 at 9. On

---

spread from person to person, that was declared a pandemic by the World Health Organization ("W.H.O.") on March 11, 2020. *See* Centers for Disease Control and Prevention *Coronavirus Disease 2019 Frequently Asked Questions*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#covid19-basics (last visited Apr. 7, 2020); *see also* William Wan, *WHO declares a pandemic of coronavirus disease covid-19*, Washington Post, https://www.washingtonpost.com/health/2020/03/11/who-declares-pandemic-coronavirus-disease-covid-19/ (last visited Apr. 7, 2020).

February 18, 2020, DHS filed an appeal of the IJ's decision to the Board of Immigration Appeals ("BIA"). D.E. 1-5.

Petitioner has received two bond hearings since the start of his immigration detention, on March 28, 2019, and on March 17, 2020, respectively. D.E. 1-10 at 2, 1-11 at 3. An IJ denied his request for change of custody status on both occasions. *Id.*

On April 7, 2020, Petitioner filed a petition for writ of habeas corpus challenging his immigration detention pursuant to 28 U.S.C. § 2241, as well as a request for declaratory and injunctive relief  D.E. 1. In addition to his immediate release, Petitioner asks the Court to order respondents not to re-detain him pending the culmination of removal proceedings against him and to enter a judgment declaring that respondent's detention is unauthorized. *Id.* at 29. Petitioner also requests reasonable costs and attorney fees pursuant to the Equal Access to Justice Act "EAJA." On April 15, 2020, this Court convened a telephonic hearing with the parties to hear arguments pertaining to Petitioner's filing. D.E. 8.

Petitioner is thirty-eight years old and does not report any underlying health conditions. He submits that his mere detention puts him at risk of contracting COVID-19 and justifies his immediate release.

### A. COVID-19

COVID-19 is a type of highly contagious novel coronavirus that is thought to be "spreading easily and sustainably between people." How Coronavirus Spreads, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html ("How Coronavirus Spreads") (last visited April 8, 2020). The National Institutes of Health reports that the virus "is stable for several hours to days in aerosols and on surfaces[.]" COVID-19 is "spread mainly from person-to-person." *Id.* This person-to-

person spread can occur (1) between persons who are in close contact, meaning within six feet, and (2) by respiratory droplets when an infected person sneezes, coughs, or talks. *Id.* The virus can also be spread by infected persons who are not showing symptoms. *Id.*

New Jersey has been particularly hard hit, with the northern part of the state bearing the initial brunt. As of April 21, 2020, New Jersey had 92,387 cases and 4,753 deaths. COVID-19 Information Hub, STATE OF NEW JERSEY, https://covid19.nj.gov/ (last visited April 22, 2020). The total number of cases and deaths for Bergen County, Hudson County, and Essex County, respectively, were 13,356/835; 11,636/525; and 11,128/849. *Id.* New Jersey has taken numerous steps, such as the Governor's stay-at-home order on March 21, 2020, to combat the virus. In addition, New Jersey has closed schools indefinitely and closed beaches, state parks, and county parks.

### B. Essex County Correctional Facility

In response to the pandemic, ICE has taken affirmative steps to lessen the risk of exposure. *ICE Guidance on COVID-19*, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, https://www.ice.gov/coronavirus (last visited on April 8, 2020). For example, ICE temporarily suspended all social visitation at detention facilities. *Id.* ICE also released approximately 160 individuals who were over the age of 60 or pregnant. *Id.* ICE further instituted screening guidance for new detainees and indicates that it is testing detainees for COVID-19 as per CDC guidance. *Id.*

Petitioner provides a view of current conditions at ECCF, relying in part on a declaration of Rosa Santana, a Program Director at First Friends of New Jersey and New York. D.E. 10-2. Santana provides that based on her observation of ECCF during her visits over the course of the last several years, the facility cannot manage a COVID-19 outbreak. *Id.* at 9. Santana submits

that she and her colleagues have had access to detainees who have informed them that they fear for their health and safety in light of the ongoing pandemic. *Id.* at 4. Santana provides that the detainees' fear stems from their prior observations of the facility's medical care and its history of inadequately supplying detainees with hygiene products such as soap. *Id.* at 5.

Santana provides that she has participated in four telephone calls with Phil Alagia, the Chief of Staff to the Essex County Executive, as well as two ECCF wardens, between March 19, 2020, and April 9, 2020. D.E. 10-2 at 5-7. During the March 19th call, the county representatives indicated that they were still accepting new detainees, although these individuals were being screened for COVID-19 symptoms before a doctor made an ultimate admission decision. *Id.* at 6. During the March 26th call, the county representatives reported a detainee who tested positive while being treated at a hospital for other reasons. *Id.* Also on March 26th call, it was reported that the facility stopped accepting new immigration detainees. *Id.* In addition, the county advised that they were "reaching out to suppliers about ordering additional supplies of medications that have been found to help mitigate COVID-19 symptoms[.]" *Id.* On the April 9th call, the county representatives advised that 92 "people"[3] were quarantined because they may have contracted COVID-19. *Id.* at 7. The county representatives also advised that they planned to start testing detainees for COVID-19. *Id.*

Respondents submitted two declarations from the ECCF warden, Alfaro Ortiz. D.E. 6-1, 12 at 2-14. As of the date of Ortiz's most-recent declaration, dated April 20, 2020, he confirmed the following number of COVID-19 cases. First, two ICE detainees had tested positive for

---

3 The declaration does not identify whether these 92 individuals are immigration detainees or county inmates. Inmates and detainees do not come in contact with each other in the facility. D.E. 12 at 2.

COVID-19, had been treated at University Hospital, had been cleared for discharge, and are both now in isolation at ECCF. D.E. 12 at 13. Additionally, five county inmates tested positive[4]; and fifty-five members of the correctional staff, of which only nine have been cleared to resume work at the facility. *Id.*

Ortiz details the efforts of ECCF to deal with the virus. He reports that, among other things, ECCF is currently at less than 75 percent of its maximum capacity, and the ICE detention areas that are normally configured to house 60 detainees per pod, are now reduced to a maximum of 48 detainees. D.E. 12 at 3. Moreover, the pods allow for all detainees to sit at least six feet apart. *Id.* Inmates recreation periods have been modified to allow for fewer inmates to have recreation at the same time, thereby facilitating social distancing. *Id.* at 8.

ECCF requires that all county inmates, personnel, vendors, civilians undergo medical screening including temperature readings before admission in the facility. *Id.* at 3, 7. A nurse was added to the pre-booking process, so that that every inmate/detainee entering the facility is given a screening, which includes a temperature check, and inquiry into their travel and medical histories. *Id.* at 7. Further, all new inmates are quarantined for fourteen days before they are assigned to a housing unit. *Id.* at 8. Social visits were suspended on March 22, 2020, and attorney visits are limited to meetings where the detainee and the attorney are separated by a glass partition. *Id.* at 6-7.

Health care at the facility is administered by CFG Health Systems and an on-site physician director (who is available twenty-four hours), as well as several RNs, LPNs, nurse practitioners and physician assistants. *Id.* at 4. There is always a nurse practitioner in the facility, and a

---

4 County inmates are housed in Delaney Hall, a separate building across the street from where immigration detainees are housed. D.E. 12 at 13.

physician at the facility sixteen hours a day. D.E. 12 at 4. A physician is on call on a 24-hour basis for emergency needs. *Id.* The medical department has also established a new protocol for handling inmates/detainees who may suffer from health conditions that would classify them as being at a high risk of suffering severe complication from COVID-19. These inmates/detainees undergo daily monitoring and a plan to remove them from the rest of the population should the need arise. *Id.* at 5-6. The facility has also increased monitoring of all inmates/detainees for symptoms of illness. *Id.* at 6.

ECCF also educates detainees as to the "importance of hand washing and best practices to prevent COVID-19" and provides detainees daily access to sick call. *Id.* at 5, 7, 9. Extra soap is supplied to individual detainees and a disinfectant solution is brought to detainees daily to clean surfaces, although it is stored in a secured place due to its high-bleach content. *Id.* at 11-12. Additional cleaning staff have been hired in order to increase the frequency of cleaning each day. *Id.* at 6. ECCF was designed with a purge system in every housing unit that allows for fresh air to be circulated within the facility every four hours. *Id.* at 5.

If a detainee complains of COVID-19 symptoms, he is immediately evaluated and if that person exhibits symptoms, he or she is provided a surgical mask. *Id.* at 9. Symptomatic detainees are immediately taken to University Hospital *Id.* Those who test positive, but who do not require hospitalization, are quarantined in their own cell in a unit that is exclusively being used for inmates/detainees with positive COVID-19 results. *Id.* Asymptomatic detainees who have had a known exposure to COVID-19, are "co-horted" with other similarly situated detainees, for fourteen days. *Id.* at 10.

In mid-March 2020, ECCF contracted with a lab to acquire fifty COVID-19 testing kits. *Id.* at 7. ECCF is expanding its COVID-19 testing to include blood-testing to avoid risk to health

7

care workers who may be at risk due to coughing or sneezing by the person being tested. *Id.* at 14. On March 26, 2020, ECCF received 1008 Tyvek suits; 1,200 N95 masks; and 29,900 surgical masks. *Id.* at 9.

Two days after the Court heard oral arguments, Petitioner's counsel filed a letter with an unsigned declaration from Petitioner alleging, among other things, that he was experiencing COVID-19 symptoms such as a cough, he was exposed to another detainee who believed he had contracted the virus, he has no access to hand soap, the facility is short staffed and, and the facility jeopardizing the detainees' safety. D.E. 11-1 at 1-2. He also alleges that he was not able to have his cough "checked" because he does not have a fever. *Id.* at 2. Respondents subsequently filed a letter and appended Warden Ortiz's most recent declaration describing conditions at ECCF. D.E. 12. Respondents submit that the ECCF staff informed them that Petitioner had not made any complaints of experiencing COVID-19 symptoms and there are no medical records for him after March 30, 2020. *Id.* at 1.

## II.    LEGAL STANDARD

In his habeas petition, Petitioner submits that the conditions of his confinement at ECCF are in violation of his Fifth Amendment due process rights as well as his Eighth Amendment right against cruel and unusual punishment. D.E. 1 at 15-28. He further submits that his detention violates the Administrative Procedure Act ("APA"). *Id.* at 28-29. Respondents submit that Petitioner's detention under 8 U.S.C. § 1226(a) is lawful and that the conditions of his confinement do not implicate any of his constitutional rights. D.E. 6 at 16-28.

Injunctions and restraining orders are governed by Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1. Injunctive relief may only be granted when a party demonstrates that he has a reasonable probability of success on the merits, he will suffer immediate and irreparable

harm if the injunction does not issue, the grant of preliminary relief will not result in greater harm to the nonmoving party, and the injunctive relief is in the public interest. *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385-86 (3d Cir. 2012) (citing *Crissman v. Dower Down Entm't Inc.*, 239 F. 3d 357, 364 (3d Cir. 2001)).

> [W]e follow our precedent that a movant for preliminary equitable relief must meet the threshold for the first two "most critical" factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief. If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

Like injunctive relief in general, granting bail to a habeas petitioner is an extraordinary remedy. *See Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and ... when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted); *see also In re Souels*, 688 F. App'x 134, 135-36 (3d Cir. 2017).

**III.   DISCUSSION**

Petitioner is a civil detainee. as opposed to a criminal prisoner who has been convicted and sentenced, therefore Petitioner's conditions of confinement claim are analyzed under the Due Process Clause of the Fifth Amendment, as opposed to the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979). Civil immigration detainees are entitled to the same due process

9

protections as pretrial detainees when the conditions of confinement fall below constitutional minimums. *E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019).

The Third Circuit has articulated the following relevant standards:

> To determine whether challenged conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, we may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees."

*E. D. v. Sharkey*, 928 F.3d at 307 (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). As a result, the Court must ascertain whether the conditions serve a legitimate purpose and whether the conditions are rationally related to that legitimate purpose. *Hubbard* 538 F.3d at 232.

A condition or purported deprivation amounts to punishment if the "disability is imposed for the purpose of punishment" in other words, there is "an expressed intent to punish on the part of detention facility officials;" no "alternative purpose to which may rationally be connected is assignable for it" or is "excessive in relation to the alternative purpose assigned [to it]." *Bell*, 441 U.S. at 538 (internal citation omitted). The "inquiry into whether given conditions constitute punishment must consider the totality of circumstances within an institution." *Hubbard*, 399 F.3d at 160 (internal quotation marks and citations omitted).

District Courts have reached different conclusions when conducting this inquiry in the context of the current pandemic. In *Dawson v. Asher*, Case No. C20-0409, 2020 WL 1304557 (W.D. Wash. Mar. 19, 2020), Judge James L. Robart found that the immigration detainees did not face improper punishment. *Id.* at *2. Judge Robart explained that the petitioner's detention was reasonably related to a legitimate governmental objective because there was no evidence that the respondents intended to punish the petitioners, respondents had a legitimate governmental

objective in preventing detained aliens from absconding and ensuring their appearance at removal proceedings, and the petitioners' confinement did not appear excessive in relation to the legitimate objective. *Id.*

The district judge in *Thakker v. Doll*, Civ. Docket No. 20-cv-480, - F. Supp. 3d -, 2020 WL 1671563, *8 (M.D. Pa. Mar. 31, 2020), reached a different conclusion. Judge John E. Jones III noted that an express intent to punish was not necessary and then found that the detention in question did not bear a rational relationship to a legitimate government objective. *Id.* Judge Jones reasoned that housing immigration detainees in close proximity and in unsanitary conditions, in light of the pandemic, did not meet a legitimate governmental objective. *Id.* Judge Jones indicated that preventing aliens from absconding would constitute a legitimate governmental aim but this objective was deeply weakened in light of COVID-19, particularly when ICE had many other options to monitor civil detainees. *Id.*

The Court agrees with the *Thakker* court that COVID-19 alters the analysis. And the Court also recognizes that jails are not designed with pandemics in mind. However, courts that have found that the conditions did not bear a rational relationship to a legitimate governmental interest in light of the pandemic, have also indicated that the individual detainee's underlying health condition weighed heavily in its analysis. *See, e.g.*, *Rafael L.O. v. Tsoukaris*, Civ. Action No. 20-3481, 2020 WL 1808843, *8 (D.N.J. Apr. 9, 2020); *Thakker*, 2020 WL 1671563, *4, 6. The Court also agree that a petitioner's individual circumstances (that is, his or hers medical condition) are critical to the analysis.

Petitioner argues that he is housed in a facility that has confirmed cases of COVID-19 by inmate/detainees and staff, and that he fears contracting the virus because of the facility's conditions. D.E. 1 at 11-14. During oral argument, Petitioner posited that the current pandemic

11

calls for a wholesale release of *all* detainees. The Court disagrees. Such a position fails to account for a particular petitioner's underlying medical issues as well as other pertinent considerations, such as whether a particular petitioner is a danger to the community or a flight risk.

The record reflects that ECCF has taken concrete, affirmative steps in response to the pandemic despite Petitioner's claims to the contrary. Warden Ortiz's most recent declaration provides an extensive list of COVID-19-related measures that the facility has taken. In fact, Rosa Santana's declaration reflects changes that the county took to address the virus over a short time period. Moreover, and perhaps most importantly, Petitioner's age and the absence of any indicia of an underlying health condition do not support the notion that he may be particularly susceptible to the virus or any severe illness stemming from contracting it.[5]

As a result, the Court does not find that Petitioner has shown a reasonable likelihood of success on his claim. Petitioner's claim based on the Due Process under the Fifth Amendement thus denied.

Petitioner next submits that his detention runs afoul of the APA. D.E. 1 at 28-29.

> The APA authorizes a court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the APA, an agency may

---

[5] The Court is aware that even those not in a vulnerable population have unfortunately experienced serious complications from the virus. The Court also understands that information concerning who is in fact vulnerable, as well as other data concerning the virus, is in a state of flux because of the relative infancy of the pandemic. As a result, the Court denies the petitioner without prejudice in case additional facts or information come to light.

In addition, Petitioner's most recent letter to the Court suggests that he is concerned he may have COVID-19 symptoms. D.E. 11. Petitioner has submitted no medical evidence in support of that assertion, and has provided no more than a purported affidavit of what he said to counsel over the phone. Nonetheless, the court views this as a different issue than his initial concern about prevention. If Petitioner should in fact contract the virus and believes that he is receiving constitutionally inadequate care, he can file an amended petition.

> not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books"; to do so would be arbitrary and capricious. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). It is well settled that "rules promulgated by a federal agency that regulate the rights and interests of others are controlling upon the agency," and that a failure to follow those rules without explanation is arbitrary, capricious, and an abuse of discretion. *Leslie v. Att'y Gen. of U.S.*, 611 F.3d 171, 175 (3d Cir. 2010).

*De Jesus Martinez v. Nielsen*, 341 F. Supp. 3d 400, 410 (D.N.J. Sept. 14, 2018).

Petitioner does not elaborate with any precision his claims as to the APA. Respondents submit that both subsection §1252(a)(2)(B)(ii) of the Real ID Act and 8 U.S.C. § 1182(d)(5)(A) preclude the Court from considering this claim, as it is solely within the purview of DHS. D.E. 6 at 29. Assuming Petitioner is referencing the IJ's last decision denying a change to his custody status, this Court does not have jurisdiction to entertain this claim.

In order for this Court to have APA jurisdiction, "the agency action must be final, must adversely affect the party seeking review, and it must be non-discretionary." *Pinho v. Gonzalez*, 432 F.3d 193, 200 (3d Cir. 2005). Here, Petitioner's appropriate remedy after the IJ denied his March 17, 2020, bond hearing was to appeal the decision to the BIA, which he did not do. *Id.* ("Finality requires exhaustion of administrative remedies.") Next, the IJ's decision was discretionary rather than a "purely legal" decision. *Id.* at 203. The agency's decision to deny Petitioner's request for a change in his custody status, was determined by in large part, its concern with Petitioner's 2019 arrest for allegedly sexually assaulting a minor. D.E. 1-11 at 3. The agency action at issue here was not final and was not non-discretionary, thus precluding this Court from review. This claim is thus denied.

For the foregoing reasons, the Court finds that Petitioner has not shown a substantial likelihood of success on the merits of his Petition for Writ of Habeas Corpus.

13

**IV.     Conclusion**

The Court denies without prejudice Petitioner's Petition for writ of habeas corpus pursuant to U.S.C. § 2241, as well as his request for immediate release and declaratory judgment.   D.E. 1. Because Petitioner's habeas petition and motion for immediate release, are denied, he is not entitled to fees and attorney costs pursuant to EAJA.   An appropriate Order accompanies this Opinion.


Dated: 4/22/2020

                                                                                   JOHN MICHAEL VAZQUEZ
                                                                                    United States District Judge